NOT RECOMMENDED FOR PUBLICATION
File Name: 08a0289n.06
Filed: May 22, 2008

NO. 07-3961

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

PERRY LACY,

                Petitioner,                 PETITION FOR REVIEW OF

v.                                       A DECISION OF THE UNITED
                                           STATES DEPARTMENT OF
UNITED STATES DEPARTMENT,         AGRICULTURE
OF AGRICULTURE,

                Respondent.
_____/

BEFORE:    SUHRHEINRICH, CLAY, and COOK, Circuit Judges.

      **SUHRHEINRICH, Circuit Judge**. Perry Lacy ("Lacy"), owner of the horse "Mark of Buck," seeks review of the decision by the United State Department of Agriculture's ("USDA") Judicial Officer ("JO") that he violated the Horse Protection Act ("HPA"), 15 U.S.C. §§ 1821-1831, by attempting to show Mark of Buck when the horse was "sore." Because substantial evidence supports the JO's decision, we **DENY** Lacy's petition for review, and **AFFIRM** the decision of the JO.

I.

      On the evening of August 25, 2002, Lacy entered Mark of Buck in the 64th Annual Tennessee Walking Horse National Celebration ("Celebration"), in Shelbyville, Tennessee. Lacy employed Donald Campbell ("Campbell") as Mark of Buck's trainer, and Campbell presented the horse for inspection at the Celebration.

Several Designated Qualified Persons ("DQP")[1] were working that evening at the Celebration to check for soreness.[2] DQPs Henry Chaffin and Ira Gladney examined Mark of Buck. Both found that the horse "led slow" and reacted strongly to palpation of the front feet, and agreed that the horse was sore. The DQPs documented their findings in affidavits, issued Lacy a DQP ticket stating that Mark of Buck was sore in violation of the HPA, and disqualified the horse from showing.

The USDA's Animal and Plant Health Inspection Service ("APHIS") assigned two Veterinary Medical Officers ("VMO"), Drs. Michael Guedron and Lynn Bourgeois, to monitor the DQPs and inspect horses at the Celebration that evening. After observing the DQPs' examinations of Mark of Buck, Dr. Guedron inspected Mark of Buck and elicited "strong, repeatable, reproducible pain responses" on the horse's front feet. VMO Dr. Bourgeois inspected the horse, and noted that it displayed "strong, repeatable, reproducible pain responses" upon palpation of its front pasterns, including severe clenching of its abdominal muscles and attempts to withdraw its limb and redistribute its weight to the hind legs. Dr. Bourgeois concluded that Mark of Buck "was sored with caustic chemicals and/or overwork in chains." Drs. Guedron and Bourgeois conferred and agreed that Mark of Buck was sore.

Eleven days later, on September 5, 2002, Campbell, Mark of Buck's trainer, reported to Lacy

---

[1]DQPs are employed by horse industry organizations and are delegated authority to determine if horses are sore. 15 U.S.C. § 1823; 9 C.F.R. § 11.7. DQPs need not be veterinarians, but must attend USDA-certified horse industry organization DQP training programs. DQPs examine every horse before it is permitted to show at a horse show, and they examine post-show all horses finishing first in Tennessee Walking horse events. 9 C.F.R. § 11.20.

[2]Soring occurs when an injury to or sensitization of a horse's legs, rather than training and breeding, is used to induce the high stepping gait for which Tennessee Walkers are known. *Rowland v. United States Dep't of Agric.*, 43 F.3d 1112, 1113 (6th Cir. 1995) (citing *Thornton v. United States Dep't of Agric.*, 715 F.2d 1508, 1510 (11th Cir. 1983)).

that the horse appeared "tired" and "lifeless," and that the horse needed to be seen by a veterinarian. Campbell transported the horse to Dr. John O'Brien, a private veterinarian in Bowling Green, Kentucky, who examined the horse. Dr. O'Brien inspected the horse, and observed that Mark of Buck had a scared and anxious look, was hypersensitive to touch, and had a "somewhat ataxic" gait. Dr. O'Brien described the horse's symptoms as "mild at the time we saw it." Dr. O'Brien took a blood sample from the horse, which tested positive for West Nile Virus.

On January 18, 2006, the Acting Administrator of the APHIS instituted a disciplinary administrative proceeding under the HPA by filing a complaint against Lacy. The complaint alleged that Lacy violated the HPA by: (1) entering Mark of Buck in the Celebration for the purpose of showing or exhibiting the horse while the horse was sore, in violation of 15 U.S.C. § 1824(2)(B); and (2) allowing such showing or exhibiting, in violation of 15 U.S.C. § 1824(2)(D). In his answer, Lacy admitted that he owned Mark of Buck and that he entered the horse in the Celebration, but denied he entered, or allowed to be entered, the horse in the Celebration while it was sore.

On August 22, 2006, an Administrative Law Judge ("ALJ") conducted a hearing. The Agency presented the testimony of an APHIS investigator and VMO Dr. Bourgeois, introduced nine exhibits, and offered a copy of a videotape taken of the pre-show inspections of Mark of Buck on the evening of August 25, 2002. Lacy presented the testimony of Dr. O'Brien, introduced two exhibits, and testified on his own behalf. The ALJ refused to enter into the record the copy of the videotape, concluding that APHIS had not provided a copy of the videotape to Lacy in a timely manner.

On October 23, 2006, the ALJ issued a Decision and Order dismissing the complaint after finding that: (1) Mark of Buck was not sore within the meaning of the HPA on August 25, 2002; and

(2) although the Agency presented sufficient evidence to satisfy the HPA's presumption that a horse is sore when it exhibits sensitivity to palpation in both of its front feet, Lacy adequately rebutted the presumption because: (i) Lacy presented evidence that Mark of Buck had contracted West Nile Virus; and (ii) the presence of West Nile Virus explained the horse's bilateral sensitivity at the pre-show inspection.

The Agency appealed the ALJ's decision to the JO,[3] and on June 29, 2007, the JO reversed. The JO concluded that Lacy violated the HPA by entering Mark of Buck in the Celebration while the horse was sore, because Lacy's evidence that the horse tested positive for West Nile Virus eleven days later did not rebut the HPA's presumption of soreness. The JO also found that the ALJ erred in excluding the videotape, but the exclusion was not "unduly prejudicial." The JO imposed a civil penalty of $2,200 on Lacy and disqualified him from showing, exhibiting, or entering any horse, and from managing, judging, or otherwise participating in any horse show, horse exhibition, horse sale, or horse auction for a period of one year.

## II.

## A.

In his petition for review, Lacy contends that the JO's finding that he failed to rebut the statutory presumption of soreness was not supported by substantial evidence. Lacy also argues that we should affirm the JO's determination that the ALJ's exclusion of the videotape in the August 22, 2006 hearing was not unduly prejudicial.

This Court reviews an administrative decision of the Secretary of Agriculture under the HPA

---

[3]The Secretary of Agriculture has delegated authority to the JO to act as final deciding officer in the USDA's adjudicatory proceedings subject to 5 U.S.C. §§ 556 & 557. 7 C.F.R. § 2.35.

to determine whether the proper legal standards were employed and substantial evidence supports the decision. *Bobo v. USDA*, 52 F.3d 1406, 1410 (6th Cir. 1995). "Substantial evidence means 'more than a scintilla but less than a preponderance' of the evidence," and "'must be based upon the record taken as a whole.'" *Bobo*, 52 F.3d at 1410 (quoting *Elliott v. Administrator, Animal & Plant Health Inspection Serv.*, 990 F.2d 140, 144 (4th Cir. 1993); *Gray v. United States Dep't. of Agric.*, 39 F.3d 670, 675 (6th Cir. 1994)).

Unlike a federal court, a JO "sitting in review of an ALJ's initial decision, is authorized by statute to substitute [his] judgment for that of the ALJ." *Parchman v. USDA*, 852 F.2d 858, 860 n.1 (6th Cir. 1988) (quoting *Farrow v. USDA*, 760 F.2d 211, 213 (8th Cir. 1985)) (internal quotations omitted). However, where findings of fact are based on determinations of witness credibility, the ALJ's findings are given greater weight. *Rowland v. USDA*, 43 F.3d 1112, 1114 (6th Cir. 1995).

**B.**

Section 1824(2) prohibits showing a sore horse. A horse is sore if chemicals or other implements have been used on its front feet to make them highly sensitive to pain. 15 U.S.C. § 1821(3). A horse is presumed to be sore "if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." *Id*. § 1825(d)(5).

The JO concluded that the horse met the statutory definition for being sore, relying on the statutory presumption of soreness. *See id.* We find no error in the JO's conclusion that the horse met the statutory presumption of soreness because substantial evidence supports this finding.

Seven documents in the record constitute substantial evidence that Mark of Buck was "abnormally sensitive":

*First*: the APHIS Form 7077, entitled "Summary of Alleged Violations." The form was

completed and signed by VMO Dr. Guedron, and later signed by VMO Dr. Bourgeois. The form contains a checkbox indicating that the horse was "sore" as defined under the HPA, and also a chart noting the locations on the horse where Drs. Guedron and Bourgeois found "[a]reas of consistent, repeatable pain responses."

*Second*: the "DQP Ticket" form, number 23383. The form was completed by DQPs Chaffin and Gladney after their inspection of Mark of Buck, and states that Mark of Buck was "bilateral sore" in violation of the HPA, and a checkbox notes that the DQPs "notified Show Management that [Mark of Buck] was excused or disqualified."

*Third*: the DQP Examination Form. The form was completed by DQP Chaffin, and notes that the horse "led slow," and exhibited "strong takeaway motion" upon palpation of the medial and anterior surfaces of both limbs.

*Fourth*: the affidavit of DQP Chaffin. The affidavit, sworn to on the date of inspection, states that Campbell, Mark of Buck's trainer, presented the horse for inspection, and that "the horse was bilateral sore in both front feet," "led slowly," "turned . . . slowly," and had "strong takeaway motion" on the front limbs upon palpation.

*Fifth*: the DQP Examination Form. The form was completed by DQP Gladney, and notes that the horse "led slowly," "turned slow[ly],""reacted to palpation" on the front of the left foot's coronary band, and "reacted strongly" to palpation on the front of the right foot's coronary band.

*Sixth*: the affidavit of DQP Gladney. The affidavit, sworn to on the date of inspection, states that Campbell presented the horse for inspection, and that "the horse was bilateral sore in both front feet," "led slowly," "turned . . . slowly," and upon palpation the horse "reacted on [the] left front foot coronary band and [the] right front foot . . . coronary [band] and outside."

*Seventh*: the affidavit of VMO Dr. Bourgeois. The affidavit, sworn to on September 5, 2002, states that: Dr. Bourgeois observed DQP Gladney's inspection of the horse, in which the horse "lead[] slowly," and "digital palpation of anterior aspects of both fore pasterns elicited repeatable pain responses characterized by withdrawal, abdominal tucking and tucking back on hind limbs"; DQPs Chaffin and Gladney then diagnosed the horse as "bilateral sore"; Dr. Bourgeois observed VMO Dr. Guedron's examination, in which the horse "led slowly and reluctantly," and Dr. Guedron "elicit[ed] strong, repeatable, reproducible pain responses characterized by strong withdrawal, rocking back on hind limbs to redistribute weight[,] and marked tucking of abdominal muscles"; and Dr. Bourgeois conducted her own inspection of the horse, in which "visual observation and digital palpation" of the posterior pasterns was normal, but palpation of each "entire anterior pastern elicited strong, repeatable, reproducible pain responses characterized by attempts [by the horse] to withdraw [the] limb from [her] grasp, rocking back onto [its] hind limbs to redistribute [its] weight[,] and severe clenching of [its] abdominal muscles."

Lacy challenges the documentary evidence relating to VMO Dr. Guedron and DQPs Chaffin and Gladney for the reason that they did not testify. This argument lacks merit. First, "the Administrative Procedure Act (APA) provides that an agency conducting a hearing may receive '[a]ny oral or documentary evidence.'" *Gray*, 39 F.3d at 676 (quoting 5 U.S.C. § 556(d)). Second, although our "missing witness rule" provides for an adverse inference to arise in some instances from a party's failure to present live testimony, Lacy never raised the issue below. According to the "missing witness rule," an adverse inference arises "when a party fails to call a witness peculiarly within his power to produce and whose testimony would elucidate the transaction." *Bennett v. United States Dep't of Agric.*, 219 Fed. App'x 441, 447 (6th Cir. 2007) (quoting *United States v.*

-7-

*Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973) (quotation marks and alterations omitted). The Secretary of Agriculture also applies this adverse inference in proceedings under the HPA. *See Bennett*, 219 Fed. App'x at 447 n.4 (citing *In re David Tracy Bradshaw*, 59 Agric. Dec. 228, 2000 WL 799108, at *16 (June 14, 2000)). Although we need not determine whether or how the "missing witness rule" applies–because Lacy never raised the issue below–we note that the rule would not apply, in any event, to the affidavit of VMO Dr. Bourgeois, who did testify. In the proceedings below, Dr. Bourgeois testified consistently with her affidavit that the horse "present[ed] pain responses upon palpation of the anterior pasterns." She also testified that she observed the inspections conducted by VMO Dr. Guedron and DQP Gladney, which were, in turn, consistent with the forms and affidavits that they submitted.

Lacy argues that JO erred in crediting the affidavit of Dr. Bourgeois because her testimony at the August 22, 2006 hearing was not based on a present recollection of her examination of Mark of Buck. Dr. Bourgeois's testimony was instead based on past recollections recorded in her affidavit and on the Summary of Alleged Violation Form. Lacy's argument lacks merit, however, because "this Court has previously held that the affidavits of VMOs and Summary of Alleged Violations Forms are reliable and probative." *Turner v. USDA*, 217 F. App'x 462, 467 (6th Cir. 2007) (citing *Gray*, 39 F.3d at 676). In *Gray* we held that the affidavits of the VMOs and a Summary of Alleged Violations Form satisfied the admissibility criteria where the VMOs in that case had no independent recollection because "[t]hey were signed and/or prepared by individuals who were experienced in their tasks and who had no reason to record their findings in other than an impartial fashion. Moreover, the documents were created almost contemporaneously with the observations they relay." *Gray*, 39 F.3d at 676. The affidavit and Summary of Alleged Violations Form of VMO Dr.

Bourgeois satisfify this criteria: Dr. Bourgeois is an experienced veterinarian; there is no evidence that she did not conduct her inspection of Mark of Buck in an impartial fashion; and she prepared her statement for her affidavit on August 30, 2002,[4] only five days after inspecting of the horse. Thus, the JO did not err in crediting VMO Dr. Bourgeois's affidavit.

Accordingly, we find that the USDA produced substantial evidence that the horse was "abnormally sensitive" sufficient to trigger the § 1825(d)(5) statutory presumption of soreness.

### C.

Although a horse is presumed sore "if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs," 15 U.S.C. § 1825(d)(5), "it is well settled that the presumption of soreness is rebuttable." *Zahnd v. Sec'y of Dep't of Agric.*, 479 F.3d 767, 772 (11th Cir. 2007) (quoting *In re Martin*, 53 Agric. Dec. 212, 223 (Mar. 16, 1994)). Lacy contends that the JO's conclusion that Lacy failed to rebut the statutory presumption that Mark of Buck was sore was not supported by substantial evidence.

The ALJ found that Lacy rebutted the statutory presumption of soreness by presenting the testimony of Dr. O'Brien. Dr. O'Brien testified that Mark of Buck had contracted West Nile Virus, a condition that explained the horse's bilateral sensitivity on the date of the inspection. He further testified that Mark of Buck reacted with hypersensitivity associated with encephalitis resulting from West Nile Virus rather than soring during its inspection at the Celebration.

The JO disagreed with the ALJ's conclusion that Lacy rebutted the statutory presumption of soreness. The JO found that Dr. O'Brien did "not identify a clear connection between his diagnosis

---

[4]The affidavit was sworn on September 5, 2002.

on September 5, 2002, that Mark of Buck contracted West Nile Virus[,] and the observation of USDA veterinarians and the DQPs 11 days earlier." The JO first noted Dr. O'Brien's testimony that he had little knowledge of the examinations done on the horse on August 25, 2002. Next, the JO noted that Dr. O'Brien did "not explain how the encephalitis caused hypersensitivity in Mark of Buck that was limited to pinpoint spots on the front of the horse's feet." The JO then noted that Dr. O'Brien's observation of Mark of Buck's presentation on September 5, 2002, was markedly different from the observations of the DQPs and VMOs on August 25, 2002; while Dr. O'Brien found the horse exhibiting ataxia, hypersensitivity, and anxiousness, VMO Dr. Bourgeois found none of these symptoms.

We find that the substantial evidence supports the JO's conclusion that Lacy failed to rebut the statutory presumption of soreness. The JO was reasonable in discounting Dr. O'Brien's testimony that West Nile Virus was responsible for Mark of Buck's bilateral sensitivity during the horse's inspections at the Celebration. First, the presentation of Mark of Buck during its inspection at the Celebration was consistent with soring, not West Nile Virus as described by Dr. O'Brien. *See In re Billy Gray*, 52 Agric. Dec. 1044, 1993 WL 308542, at *21 (July 23, 1993) (noting that USDA VMOs "follow a simple procedure to distinguish [high-strung, or nervous, or silly] horses from those that are experiencing pain. . . . "[T]hey look for . . . specific spots which were painful when palpated."), *aff'd sub nom*. *Gray v. USDA*, 39 F.3d 670 (6th Cir. 1994). The horse exhibited pin-point pain responses solely in the front surfaces of the pasterns at the Celebration. VMO Dr. Bourgeois testified that West Nile Virus, conversely, would *not* cause pin-point pain responses solely in the front surfaces of the pasterns. Second, although Dr. O'Brien did not observe pin-point pain responses on the horse's front pasterns during his exam, finding no response to digital palpation of

the coronary band through the pastern area, he acknowledged that the temporal proximity from the inspections on August 25, 2002, to his inspection on September 5, 2002, may have explained the horse's responses on the latter date.

Lacy also argues that the JO erred in crediting VMO Dr. Bourgeois's testimony, because Dr. Bourgeois had no training or experience with West Nile Virus. We disagree, because Dr. Bourgeois testified that she had studied and was familiar with encephalitis, a symptom of West Nile Virus.

**D.**

The JO found that the ALJ's exclusion of the videotape of Mark of Buck's examination was erroneous but not unduly prejudicial to the Agency, and that substantial evidence, exclusive of the videotape, supported its finding that the horse was sore when it was entered in the Celebration. Because we find that substantial evidence supports the JO's decision that Mark of Buck was sore, we need not reach the issue of the videotape's admissibility.

**III.**

For the foregoing reasons, we **DENY** Lacy's petition for review, and **AFFIRM** the decision of the Judicial Officer.